1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## DISTRICT OF NEVADA

8

DUANE WASSON et al.,                              )
9                                                 )
                      Plaintiffs,                 )
10                                                )          3:10-cv-00123-RCJ-RAM
         vs.                                      )
11                                                )
PYRAMID LAKE PAIUTE TRIBE et al.,                 )          **ORDER**
12                                                )
                      Defendants.                 )
13  _____           )

14          Plaintiffs have sued the Pyramid Lake Paiute Tribe, several tribal officials, several employees

15  of the Bureau of Indian Affairs ("BIA"), and a tribal consultant residing in Colorado for declaratory

16  and injunctive relief.  Pending before the Court are Plaintiff's Motion for Temporary Restraining

17  Order (ECF No. 10) and Motion for Preliminary Injunction (ECF No. 9).  For the reasons given

18  herein, the Court denies the motions.

19  **I.      FACTS AND PROCEDURAL HISTORY**

20          In the Complaint, Plaintiffs characterize the nature of the case as follows:

21          The Pyramid Lake Tribal Council under past and current three Tribal
            Administrators violate [sic] the requirements of due process rights and equal
22          protection under the law which are guaranteed under The Indian Civil Rights Act of
            1968; The Constitution and Bylaws of the Pyramid Lake Paiute Tribe, approved in
23          1936; pyramid Lake Tribal Code, Title 9, Election Code (resolution # PL91-00);
            Code of Federal Regulations 25 Indians. The Council continually violates Petition(s)
24          and Election Referendum votes, by doing so the subject matter of the petitions are
            ignored or never addressed. For this reason we must bring forward the subject matter
25          contained in the three petitions and due process violations.

1   (Compl. 5 ¶ B.1, ECF No. 4).  The Complaint is 242 pages long.  Count 1 for violation of due

2   process rights [under the Indian Civil Rights Act of 1968 ("ICRA")] is listed on page six.  This count

3   is immediately followed by approximately 100 pages of various evidence not independently marked

4   as exhibits, after which the Complaint continues.  Count 2 for violation of due process rights [under

5   the Constitution of the Pyramid Lake Paiute Tribe] then appears on a page of the evidence, and this

6   is followed by approximately 100 more pages of evidence before the Complaint resumes and

7   concludes.  Plaintiffs allege to have exhausted administrative, tribal court, and tribal appellate court

8   remedies.

9        The present motion for a TRO lists seven causes of action, which are not commensurate with

10  those in the Complaint: (1) violation of the right to petition the government for redress of grievances

11  under the United States Constitution and Pyramid Lake Constitution and Bylaws; (2) violation of

12  Public Law 101-618; (3) an unconstitutional taking under the Fifth and Fourteenth Amendments

13  based on the BIA's failure to reimburse Plaintiffs for funds the BIA paid to an attorney—who it was

14  later discovered was unlicensed to practice law—to represent the Tribe in a water rights matter;[1] (4)

15  unconstitutional taking of water rights under the United States Constitution; (5) procedural due

16  process violations under the Fifth and Fourteenth Amendments; (6) [redundant with (4)]; and (7)

17  Injunctive and Declaratory Relief.  The motion must be read in light of the Complaint, which pleads

18  only violations of due process rights under the ICRA and the Constitution of the Pyramid Lake

19  Paiute Tribe.  The motions for a TRO and a preliminary injunction do not amend the Complaint.

20  II.   **LEGAL STANDARDS**

21       Under Fed. R. Civ. P. 65(b), a plaintiff must make a showing that immediate and irreparable

22  injury, loss, or damage will result to plaintiff without a temporary restraining order.  Temporary

23  restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal.*

24  _____

25       [1]Plaintiffs appear to admit that the BIA, who originally paid the funds, has been repaid
     these funds through the attorney's insurance.  This cause of action is unintelligible as stated.

1    *Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal.

2    2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a

3    temporary restraining order.").  The standard for obtaining *ex parte* relief under Rule 65 is very

4    stringent. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006).  The temporary

5    restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo

6    and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."

7    *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423,

8    439 (1974).

9         The Ninth Circuit in the past set forth two separate sets of criteria for determining whether

10    to grant preliminary injunctive relief:

11              Under the traditional test, a plaintiff must show: (1) a strong likelihood of
         success on the merits, (2) the possibility of irreparable injury to plaintiff if
12         preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and
         (4) advancement of the public interest (in certain cases). The alternative test requires
13         that a plaintiff demonstrate either a combination of probable success on the merits
         and the possibility of irreparable injury or that serious questions are raised and the
14         balance of hardships tips sharply in his favor.

15    *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007).  "These two formulations represent two

16    points on a sliding scale in which the required degree of irreparable harm increases as the probability

17    of success decreases." *Id.*

18         The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must

19    demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 129 S. Ct. 365,

20    374–76 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test). The Ninth Circuit has

21    explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he

22    proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is

23    likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

24    preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

25    interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S.

1  Ct. at 374) (reversing a district court's use of the Ninth Circuit's pre-Winter, "sliding-scale" standard

2  and remanding for application of the proper standard).

3       A recent Ninth Circuit ruling relying largely on the dissenting opinion in *Winter* parsed the

4  language of *Winter* and subsequent Ninth Circuit rulings and determined that the sliding scale test

5  remains viable when there is a lesser showing of likelihood of success on the merits amounting to

6  "serious questions," but not when there is a lesser showing of likelihood of irreparable harm. *See*

7  *Alliance for the Wild Rockies v. Cottrell*, No. 09-35756, 2010 WL 3665149, at *5–7 (9th Cir. July

8  28, 2010, amended Sept. 22, 2010). As a preliminary matter, to the extent this interpretation of

9  *Winter* is inconsistent with that in *Selecky, Selecky* controls. *See Miller v. Gammie*, 335 F.3d 889,

10  899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision,

11  only the en banc court may overrule a decision by a three-judge panel).

12       In any case, the Supreme Court has made clear that a movant "must establish that he is likely

13  to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

14  relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest."

15  *Winter*, 129 S. Ct. at 374 (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod.*

16  *Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12

17  (1982)) (emphasis added). The Supreme Court in *Winter* recited the four prongs of the test in the

18  conjunctive, and it specifically used the word "likely" twice, once to modify the success-on-the-

19  merits prong, and again to modify the irreparable-injury prong. It is almost inconceivable that it did

20  so inadvertently or that it was unaware of the grammatical import of this formulation. Immediately

21  after reciting the standard, the Court rejected the "possibility" standard as to the irreparable-injury

22  prong as "too lenient" precisely because the "frequently reiterated" four-prong test modifies that

23  prong with the word "likely," which the Court emphasized in the opinion. *See id.* at 375. The test

24  modifies the success-on-the-merits prong the same way.

25       In summary, to satisfy *Winter*, the movant must show that he is "likely" to succeed on the

1  merits.  To the extent the *Cottrell* court meant to imply that its "serious questions" standard was a

2  lesser standard than "likely," it is inconsistent with *Winter* and *Selecky*.  This Court must reconcile

3  the cases by interpreting the *Cottrell* "serious questions" requirement to be in harmony with the

4  *Winter/Selecky* "likelihood" standard, not as being in competition with it.  The movant must

5  therefore show that there are serious questions as to the merits, such that his success is likely.  A

6  claim can be weaker on the merits than it would normally need to be if it raises "serious questions"

7  and the amount of harm the injunction will prevent is very great, but the chance of success on the

8  merits cannot be weaker than "likely." *Winter*, 129 S. Ct. at 374.

9  **III.    ANALYSIS**

10         Plaintiffs cannot succeed on the merits of the Complaint as written.  Congress has plenary

11  power over the Indian tribes, *see, e.g.*, *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903), which

12  under American law exist as "domestic dependent nations," *Cherokee Nation v. Georgia*, 30 U.S.

13  1, 17 (1831).  As a starting point in American history, tribes existed as sovereign nations. *Id.* at

14  59–60.  However, the tribes' sovereignty has been "necessarily diminished" via conquest by other

15  sovereigns, such as England, France, Holland, Spain, and Portugal, all of whom recognized the

16  principal that a conquered people retained the right to occupy the land, but that certain aspects of

17  sovereignty became forfeit. *Johnson v. McIntosh*, 21 U.S. 543, 574–76 (1823).  Congressionally

18  recognized tribes retain all aspects of sovereignty they enjoyed as independent nations before they

19  were conquered, with three exceptions: (1) they may not engage in foreign commerce or other

20  foreign relations, *see Worcester v. Georgia*, 31 U.S. 515, 559 (1832); (2) they may not alienate fee

21  simple title to tribal land without the permission of Congress, *see McIntosh*, 21 U.S. at 574; and (3)

22  Congress may strip a tribe of any other aspect of sovereignty at its pleasure, *see Oliphant v.*

23  *Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978), *superseded on other grounds by* 25 U.S.C.

24  § 1301(2), (4) (1990).  In summary, any aspects of sovereignty consistent with the tribes' dependent

25  status, and which have not been taken away by Congress, remain with the tribes.

1    Because the tribes retain their sovereignty generally, and because this sovereignty predates

2    the Constitution and does not depend upon it, the Constitution does not bind tribal governments with

3    respect to tribe members. *Talton v. Mayes*, 163 U.S. 376, 382–84 (1896). Plaintiffs' claims against

4    tribal officials under the due process clauses (or any other provisions) of the United States

5    Constitution therefore fail as a matter of law. In 1968, Congress passed the ICRA to provide certain

6    protections for Indians as against their own tribal governments. These protections roughly parallel

7    the protections afforded by the Bill of Rights as against the federal and state governments, but the

8    only remedy available under the ICRA is habeas corpus. Injunctive and declaratory relief, as

9    Plaintiffs request, are not available. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–62 (1978)

10   (holding that the Indian tribes retain sovereign immunity from suit except where waived, and the

11   ICRA waived sovereign immunity only as to the rights enumerated therein, and only with respect

12   to the remedy of habeas corpus, not injunctive or declaratory relief). The tribal defendants are

13   therefore not amenable to the present suit under either the United States Constitution or the ICRA.

14   Finally, the BIA officials and the private tribal consultant may not be sued in this Court based

15   on the facts alleged. The form Complaint asks Plaintiffs to "[e]xplain how [the BIA officials and

16   the private tribal consultant were] acting under color of law," to which Plaintiffs respond "Tribal and

17   Federal Law" and "Under Tribal Laws approved by the Dept of the Interior," respectively. (Compl.

18   3–4). Insofar as these Defendants were acting on behalf of the Tribe, they are immune from suit, and

19   the simple fact that the BIA approved the Tribe's constitution and/or bylaws does not make the BIA

20   itself, or its officials, amenable to suit as to the Tribe's allegedly unconstitutional actions thereunder.

21   Under the Indian Reorganization Act of 1934 ("IRA") § 16, an Indian tribe may adopt a constitution

22   and bylaws, which become effective upon ratification by a majority of adult members of the tribe

23   and approval by the Secretary of the Interior. *See* 25 U.S.C. § 476(a). A federal court, however, does

24   not have subject matter jurisdiction under either the IRA or the Administrative Procedures Act to

25   entertain a suit against any defendant, Indian tribe or no, based on the alleged violation of tribal

Page 6 of 8

1   election procedures, which is "an internal controversy among Indians over tribal government."

2   *Motah v. United States*, 402 F.2d 1, 2 (10th Cir. 1968). Nor is there any exception to federal

3   sovereign immunity that would permit such a suit against BIA officials. *Motah*, 402 F.2d at 2 (citing

4   *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Plaintiffs complain of the alleged failure of

5   the Tribe to entertain petitions or honor referenda results. These are internal affairs of the Tribe over

6   which the Court lacks subject matter jurisdiction. *See* Felix. S. Cohen, *Federal Handbook of Indian*

7   *Law* 126 (1971) ("Such power [of sovereignty] includes the right to define the powers and duties of

8   [tribal] officials, the manner of their appointment or election, the manner of their removal, the rules

9   they are to observe in their capacity as officials, and the forms and procedures which are to attest to

10   the authoritative character of acts done in the name of the tribe."). A tribe is immune from suit as

11   a sovereign, except where Congress has specifically stripped that immunity. *See id.* at 283–84

12   (quoting *Thebo v. Choctaw Tribe of Indians*, 66 F. 372, 373–76 (8th Cir. 1895)); *see also Turner v.*

13   *United States*, 248 U.S. 354, 358 (1919) ("Without authorization from Congress, the Nation could

14   not then have been sued in any court; at least without its consent."). Plaintiffs identify no statute

15   permitting suit here, except for the ICRA, the sole remedy under which is habeas corpus, not

16   declaratory or injunctive relief.

17        Plaintiffs therefore have no chance of success on the merits of the Complaint as currently

18   written. Plaintiffs have filed several motions to amend the Complaint to add additional claims

19   alluded to in the present motions but which are not yet a part of the Complaint. One such claim is

20   that the Tribe and/or the BIA has failed to make required individual distributions of the interest on

21   certain settlement funds. (*See* Mot. TRO 2, Apr. 12, 2010, ECF No. 9 (citing Pub. L. 101-618)). The

22   Court potentially has jurisdiction to adjudicate such a claim, at least as to the BIA. Unlike matters

23   pertaining to the internal affairs of the Tribe, such as the Tribe's internal duties to its own members,

24   an alleged violation of the United States' trust duties to Plaintiffs with respect to tribal funds can be

25   adjudicated, *see* Cohen at 97, but the nature of the rights of individual Indians to receive payments

1   from the United States under the present circumstances will depend on the interpretation of specific

2   treaties or statutes, *see id.* at 183.  It is possible that Public Law 101-618 requires direct distributions

3   by the BIA to individual Indians.  Such a controversy would be judiciable.  If, however, this law

4   provides only for wholesale payment to the Tribe as a corporate entity for the collective benefit of

5   its members, it is unclear whether the Court would have jurisdiction to adjudicate an individual

6   Indian's grievance concerning the Tribe's alleged misuse of such payments if it is admitted that the

7   United States has made required distributions to the Tribe itself, although the Court would probably

8   have jurisdiction to adjudicate a claim against the BIA that it violated its duty to distribute certain

9   funds to the Tribe itself where the law required it.  Because the precise nature of these potential

10  claims are not yet clear, the Court will not dismiss the case for lack of subject matter jurisdiction at

11  this time.  The Court, however, strongly advises Plaintiffs to obtain the assistance of counsel, as the

12  nature of the claims are not entirely clear as currently written, and Plaintiffs risk losing potentially

13  valid claims due to their inability to clearly communicate them to the Court.  Plaintiffs indicated at

14  oral argument that they had retained an attorney.  Plaintiffs should, with the assistance of counsel,

15  file a requested first amended complaint in order to neatly delineate and clarify their claims under

16  Rule 8.

**CONCLUSION**

18      IT IS HEREBY ORDERED the Motion for Temporary Restraining Order (ECF No. 10)

19  and Motion for Preliminary Injunction (ECF No. 9) are DENIED.

20      IT IS SO ORDERED.

21      Dated this 20th day of October, 2010.

23                  ROBERT C. JONES
                    United States District Judge

Page 8 of 8